I would like to inform the Court that I do wish to reserve two minutes for rebuttal, and I will notify the Court when my time is running out. It is the position of the Petitioner in this matter that once the – of course, the Court is aware that the issue before us really is the decision of the Board of Immigration Appeals, and that decision the Board upheld the immigration judge in part and reversed in part. Our position is that, of course, this – this opinion lacks clarity, that there is – is not supported by reasonable, substantial, or probative evidence as set forth in the record. Under Vukmirovic v. Ashcroft, once the BIA found the petitioner to be credible, then the testimony must have been accepted as true. And the Board did not defer to the testimony at all. It noted under the Ninth Circuit law that the petitioner was credible. However, it did not apply that reasoning to a substantive review of the – of the record, in our view, because – was – was hassled a fair amount and – and perhaps discriminated against. But why does – why do the incidents that – that he experienced rise to the level of persecution on account of a protected ground at the hands of the government? At the hands of the government? Yeah. Well, first of all, Your Honor, the government failed to protect him. It is the law of the land. Of course, the – the culture is that Ramadan is – is respected. I think that in this case, the – the question of who is more religious, who's more Muslim than another, is – is really the issue here. I believe that the government's position is to honor and support those that take a more restrictive view of how Ramadan is – is protected, is – is honored in the country. And so to that extent, I think that – and also we think that there's past persecution here. As a respondent was injured. He was beaten. And his – He was beaten once, but it didn't seem to me from reviewing the record that the beating was linked to – to a protected ground. The beating doesn't seem to be explained. Well, Your Honor, I think that if you look at the line of questioning in the record at that time, that the line of questioning was flowing from an initial question of what type of persecution did the respondent suffer on account of his religious belief. And that – and that line of questioning, although may not have specifically at that point established the nexus, that the nexus is flowing from the initial line of questioning there. In addition, Your Honor, I'd like to also address the fact that what evidence do we have that the government both failed to protect him and in the future will be unwilling and unable to protect him? Because obviously the people who've done this are not themselves government officers. This is correct, Your Honor. I think the critical fact in this case and evidence in this case that supports that is the fact that it is a part of the penal code of the country. And now that he has converted – there's two things, the fact that he was not honoring Ramadan at the time in a way that was preferred by the local community, and also the fact that he has converted to Christianity since he's come to the United States. And the penal code, even though persons – I think that this was the position of the immigration judge, that there are Christians there, so why is there persecution? Well, this is a Muslim state. It is a Muslim government. The penal code makes it a crime for a Muslim to convert to Christianity. So if this Court does not agree that there was past persecution or a failure to protect, then certainly we believe that the respondent established that there would be a well-founded fear on account of his religious conversion and the penal code, which is the law of the land, which would govern the entire country, and the countrywide issue would not be a factor. My understanding is that the report shows that although that was once the case, voluntary conversion is no longer a crime in Morocco. The record, Your Honor, as I'm aware, the record that we have provided supports the position and the Interreligious Freedom Reports was that it is a crime to convert. In addition, Your Honor, I think that one thing we have to keep in mind is that in countries where there is the Muslim faith, we do have the law that may be implemented, but also the standards in the community, and also there is Sharia law. So in some countries where you may have, I mean, it's my understanding that the penal code does still reflect that, but I thank the Court for correcting me. Well, what I have here is the IJ's oral decision, and it says that on page 20 of the decision 65 of the administrative record that the Department of State International Religious Freedom Report seems to state otherwise. Your Honor, we also provided the Department of State report, and I believe the Department of State report there makes it very clear that it is a crime. And I think that that was really at the heart of the cases, because on the same language, the court was taking the immigration judge was taking a totally different interpretation of what the State Department said than what the Petitioner did. And we believe that the Interreligious Freedom Act supported the position of the Petitioner. If I may take a moment, Your Honor, I can grab the record. The record at 239 seems to go both ways, and this is the Department of State report for International Religious Freedom Report. So I see a reference that may support the proposition, although the main thing it says is that citizens who convert to Christianity and other religions sometimes face social ostracism, and in the past a small number of persons have faced short periods of questioning or detention. Voluntary conversion is not a crime under the criminal or civil codes. However, in the past, the authorities have jailed some converts on the basis of the references to Quranic law. So the reference is to what having happened in the past, but the inference I draw is that that's not currently perceived as a problem. And it becomes important because that's the other ground now being asserted by your client since he's come to this country, as I understand it. On account of the well-founded fear, Your Honor? Yes. Yes. I think that also when we look at the law, we can also look at the custom and the standards in the community, and that is the reason why the respondent wanted to have his father testify, which the court disallowed, which we believe was a violation of due process and fundamental fairness in the case. If the court did look at the record, the immigration judge, there were two merit hearings in this case. The immigration judge disallowed the witnesses that spoke to his conversion at the first hearing, but went forward, decided to continue the matter to allow a witness to come and speak to whether or not the really to impeach the respondent and speak to whether or not he had made a claim of false citizenship. We believe that this was fundamentally unfair and a lack of due process. I have two minutes. I'm just going to speak for 30 more seconds, Your Honor. And the other thing we'd like to point out is that the Board of Immigration Appeals failed to rule on the false claim of citizenship. They went on to find the respondent that the respondent was credible. The testimony of his father would have given us a better insight, a clearer view of what really would have happened to the respondent had he come back as a Muslim or strike that comeback as someone that had converted to Christianity. Thank you. Mr. O'Connor. Good morning, Your Honors. May it please the Court, I am Blair O'Connor and represent the Attorney General in this matter. Your Honors, the record in this case establishes that Christians openly can practice their faith in Morocco and that the Moroccan government officially recognizes Christianity and encourages tolerance and respect among religions. The evidence in this case also establishes that voluntary religious conversions in Morocco are not a crime under either Moroccan civil or criminal law. While Petitioner asserts that if returned to Morocco as a religious convert, he would be subjected to social ostracism and harassment, which is, while regrettable, does not rise to the level of persecution. Therefore, because the record in this case fails to compel the conclusion that Petitioner's fears of persecution if returned are objectively reasonable, this petition for review should be denied. Now, Petitioner's fear of future persecution to Morocco is solely based upon his conversion to the Church of the Jesus Christ of Latter-day Saints. While his fears may be subjectively genuine, the record does not establish that they are objectively reasonable. As was pointed out during the opening argument, the State Department clearly indicates that although Islamic law calls for punishment of those who convert from Islam, in practice under the Moroccan official law, voluntary conversions are not a violation of any part of the Moroccan Code, and that, again, although some converts from Islam may be subjected to social ostracism, which is largely what Petitioner testified to with respect to his past experiences in Morocco for not following Ramadan, that social ostracism, this court and both the Board of Immigration and Appeals has recognized by itself does not rise to the level of persecution. But the passage just read by Judge Clifton indicates not only the possibility of social ostracism, but occasional jailing. Even though the Code said it does not make it illegal, apparently there is some occasional jailing. It does, Your Honor, but it does say that we're talking about brief instances where people might be brought in and questioned and jailed for a brief period of time. But you better confront the full extent of the evidence instead of just saying all we've got is social ostracism. Absolutely, Your Honor. And again, the State Department does recognize that in few instances converts may be brought in for questioning and brief periods of detention. Again, though, you're on the respect, the government's argument would be that that by itself does not rise to the level of persecution. Let me ask about the where we're left now that the BIA has, you know, it's been a long time since we've had a case like this. It's been a long time since we've had a case like this. And I'm wondering if you could distinguish the adverse credibility ruling, but continued or, in effect, affirm the immigration judge's decision with regard to the failure to demonstrate past persecution or well-founded fear of future persecution. When I go back and look at the IJ's ruling, in particular on the persecution side, and I'm referencing here administrative record 57 and 58, which are pages 12 and 13 of the IJ's ruling, where he says, I can find no link or nexus in this case to any of the five enumerated grounds or any evidence, and then this is the phrase that caught my eye, other than respondent's testimony, which would lead this court to believe he was persecuted in the past or has a well-founded fear if he returns to Morocco. Now, the BIA separated itself from the adverse credibility determination, went on to conclude that the removal of the record could be still sustained based on the fear to demonstrate persecution. But if I look at what the IJ says, there is a suggestion, other than respondent's testimony, if respondent's testimony is credited, what does that do to the finding with regard to persecution? Well, again, Your Honor, I think the IJ's ruling was that what he testified to as to what happened to him in the past does not rise to the level of any form of harassment from the farmhands that he himself hired with respect to they called them names, they spit on them, and we have the one instance in which there was a beating, but no evidence with respect to the severity of injuries that were sustained as a result of that. You know, I read the testimony, and he keeps saying the farm people he worked with. Does he ever say that they are people that he hired? The answer is no, Your Honor. And if he did, Your Honor, on page 150 of the administrative record, he was asked if he hired the people that were persecuting them on a daily basis, and he responded that he did. Okay, let me hang on a second. Let me get there. Okay, I'm on 150. What line are you in? Let me get there, Your Honor. You're near the bottom. Now, you stated that at one point you had problems with the people on your farm. Yes. Were these the people that you hired? Yes. Did you hire these people on a daily basis? Yes. And these are the people that are beating him? Yes, he said, because it starts off by saying at one point you had problems with the people on your farm, which are the people who allegedly were spitting at him and harassing him. Yes. These are the people that you hired. Yes. Okay, thank you. So, again, we feel that the judge's decision, although part of it was based on adverse credibility, he did make the alternative merits analysis that the incidents that the petitioner suffered in the past did not rise to the level of persecution, and then with respect to the State Department reports regarding his conversion to Christianity, that they did not support an objectively reasonable well-founded fear in the event he were to be returned to Morocco. And it was that part of the IJ's decision that the board affirmed upon looking upon it independently on review, and it did not sustain the parts that go to the adverse credibility. And the board's not affirming the adverse credibility also goes to the issue of the exclusion of the witnesses. Because there was no dispute by either the immigration judge or the board that he had, in fact, converted to the Mormon Church, the judge's decision that was the only proffer given with respect to the church members was that they would testify to the fact that he had converted. There was no proffer that any of these members had actually been to Morocco, lived in Morocco, and knew how Mormons were treated in Morocco. In fact, the letter that was submitted, that was admitted into the record from the two elders in his church, again, simply goes to the fact that he converted, he participates regularly at services, and we think that he's a good member of the Mormon Church. Because that was never called into question, he can't establish any prejudice from the fact that the church members were denied to testify. And again, the proffer given as to his father, when asked by the immigration judge, why do you want the father's testimony, even though notice was given on the day of the hearing and not in compliance with the court rules 15 days in advance, his proffer was, well, I think you may have concerns about my credibility. My father can testify regarding that, and he can testify regarding my past experiences in Morocco. Because the board ultimately reversed the adverse credibility, and this Court presumes the petitioner do have been credible, again, there's just no showing whatsoever of prejudice with respect to the father's testimony. Because the board believed everything he said that happened to him in the past in Morocco was true, just even assuming that, it does not rise to the level of prejudice, and that's why I'm asking you to testify. The one thing the father might have been able to contribute beyond what you're saying, and what you say makes so far what you're saying, I think I agree with, the one thing the father might have been able to contribute in addition is his assessment as to the likelihood of bad treatment, I'm staying away from the technical word, persecution for the moment, upon his return. I'm sorry, I didn't hear you, Your Honor. That may be, Your Honor, but again, the judge clearly asked counsel for the proffers to the father's testimony. This was the only family member who had converted. All the other remaining family members were still practicing Muslims in Morocco. The country is 99 percent Muslim. No evidence was given that the father knew personally of any other Muslim converts and would have had any first-hand knowledge of how they were treated in Morocco. Well, no evidence was given because the father was not allowed to testify. I understand that, Your Honor. But again, I mean, it's important when notice is given the day of the hearing, even though the father's been in the hearing, the father's testimony, and here that proffer was just not given. And that's what the court is reviewing in determining whether there's error to exclude the father's testimony. So, barring any further questions, I would like to sum up. Again, Your Honor, because the exclusion of the witnesses was not erroneous due to the late nature given of their notice and the fact that there's no evidence of prejudice with respect to their testimony, and because the record in this case provides substantial evidence that Petitioner's fears of persecution if returned to Morocco were not objectively reasonable, the government requests that this petition for review be denied. Thank you. All right. Thank you, Mr. O'Connor. Ms. Guavia. Thank you, Your Honor. I just wanted to point out that at the Administrative Record 241, this goes to the argument I referenced earlier that, first of all, I'd like to acknowledge that it appears that the penal sanctions are against those that try to convert persons to Christianity as opposed to those that have converted. However, at AR241, the societal attitudes that I referenced earlier is very clear there, and this is a country that it comes down to and the Council for the Government has stated is overwhelmingly Muslim, and on this page down in the second paragraph under societal attitudes, it clearly states that the practices of the country are in a way, because the populace is so overwhelmingly Muslim, sort of deferred to in a way that basically once you're at that, it's just really the tyranny of the majority that we're talking about here. And I think that certainly if the father had been allowed to testify, we would have had a firsthand primary evidentiary look at what the likelihood of his persecution would have been if he returned. In terms of notice, I'd like to address that again in that the judge called the witness on his own, continued the matter to have the witness to come. It was not a witness that was called by the government. And there was no notice of that witness at that time or that he would continue the petitioner's witnesses that had been noticed up at an appropriate time given the notice of the initial hearing, which the Council had only been given a few days. So the fundamental unfairness is there, that the judge was willing to stop the case and continue to have a witness come from Southern California, but was not willing to allow the petitioner's own father who had just arrived into the country. Yes, he'd been there a long time, but he was not willing to allow the petitioner's own father to come into the country. And I think that's a very important information that would have substantially enlightened the court. At a minimum, they could have given us a continuous as well. Thank you, Your Honor. All right. Thank you, Counsel. The matter just argued will be submitted.
judges: Rymer, W. Fletcher, Clifton